IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 4, 2025 Session

## TATUM M. CAMPBELL v. T.C. RESTAURANT GROUP, LLC ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 21C382  Clifton David Briley, Judge**

_____

**No. M2024-00362-COA-R3-CV**

_____

The Plaintiff sued a musician and the establishment where he performed for negligence after the Plaintiff climbed on stage and sustained a concussion as a result of a fall from the stage while being escorted therefrom.  The jury found that the Defendants were not at fault. On appeal, the Plaintiff claims reversible error because of defense counsel's statement during opening argument that Plaintiff hoped to be a "lottery lawsuit winner" and error in admitting evidence of medical leave benefits Plaintiff obtained from her work.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

H. Anthony Duncan, Nashville, Tennessee, for the appellant, Tatum M. Campbell.

Miles T. Martindale, Olivia Park, and David M. Rich, Nashville, Tennessee, for the appellees, Chris Bullard and T.C. Restaurant Group, LLC.

**OPINION**

I.

This case turns on whether the Plaintiff fell or was pushed from the stage at a Nashville music venue.  This lawsuit came about when Tatum Campbell, the patron of an establishment in downtown Nashville, came onto the stage where musicians were performing and sustained injuries when one of the performers, Chris Bullard, attempted to escort her off the stage.  Ms. Campbell alleged that Mr. Bullard negligently "dropped" her. Mr. Bullard disagreed.  He asserted that Ms. Campbell was intoxicated and stepped

backward off the stage.  Ms. Campbell sustained a concussion and filed suit for $200,000 for lost earning capacity, pain and suffering, and loss of enjoyment of life, alleging that negligence on the part of Mr. Bullard caused her injuries.  She also sued the bar, T.C. Restaurant Group, LLC, d/b/a Luke's 32 Bridge Food + Drink (Luke's), on the theory that Mr. Bullard was an agent of Luke's and that therefore Luke's was also vicariously liable for the injuries.

During opening statements, counsel for Mr. Bullard said to the jury, "And I would submit to you jurors that the theory of Mr. Bullard's case is that Ms. Campbell hopes in this case to be a lottery lawsuit winner."  Counsel for Ms. Campbell objected, and the trial court instructed Mr. Bullard's counsel to "move on."

After the close of proof that day, Ms. Campbell's counsel filed a written motion to prohibit further such references and for a curative instruction.  The next day, Ms. Campbell's counsel reiterated that he sought curative instructions and a prohibition on further similar statements and noted he "may still move for a mistrial depending on [how] strong the curative instruction is."

The trial court raised the possibility that such an instruction would further draw the jury's attention to the statement but agreed to counsel's request.  The court proposed to address defense counsel's comment as well as the jury's demeanor on the previous day:

> THE COURT:  … So here's the instruction that I will be giving.  As the Court was a little bit concerned as well yesterday that there was maybe slightly too much laughter, and so I'm going to remind the jury that this is an important and serious matter, and that, even though we occasionally might laugh, we should always remember how serious this proceeding is and that they owe it to the parties to take it seriously.
>
> Additionally, yesterday there was a comment made by defense counsel that related to the lottery.  That was an improper statement, and the jury is to disregard it.
>
> [MS. CAMPBELL'S COUNSEL]: That's fine

The court then instructed the jury that "yesterday there was a comment by defense counsel that referred to the 'lottery.'  And that was an improper statement, and you are to disregard it."  The jury was also cautioned in the court's instructions that opening statements of counsel are not evidence.

Regarding the evidence in the case, Mr. Bullard testified that he was performing at Luke's and that, while his band was tuning their instruments, he offered a "birthday shout-out" to patrons celebrating their birthdays.  Mr. Bullard denied that the "shout-out" was an

- 2 -

invitation to come onto the stage, and he noted that other patrons celebrating birthdays did not attempt to come onto the stage. He further noted that "[i]t's just common sense" not to get on a performance stage. Mr. Bullard testified that Ms. Campbell came onto the stage intoxicated and uninvited, that she did not respond to a request to leave, and that he used his free hand to try to guide her off the stage. He indicated that he believed she was intoxicated because she almost fell while getting onto the stage, was unsteady on her feet, and smelled of alcohol. Mr. Bullard stated that, after viewing surveillance video, he recalled that she turned as he was guiding her and attempted to kiss him. At this point, according to Mr. Bullard, "In her drunken haze, she steps backwards, loses her footing, and falls off the stage." He denied that he dropped her. Mr. Bullard used the microphone to ask Ms. Campbell where her friends were in an effort to get her help after she fell; he denied this was a "taunt." Video evidence of the fall and some surrounding events was introduced at trial.[1]

Ms. Campbell, on the other hand, testified that Mr. Bullard "dropped" her. Ms. Campbell had arrived in town in the late morning on the day she went to Luke's, and she had two alcoholic drinks with her friends and family during the afternoon. Around dinner, she had two White Claws and a shot of vodka, and the group went to Luke's. At Luke's, Ms. Campbell consumed an alcoholic drink, and she received another one which she did not consume. She stated that her group was near the stage and that Mr. Bullard interacted with them. Ms. Campbell was wearing a "happy birthday" tiara. Ms. Campbell believed that Mr. Bullard was inviting her on stage when he referenced a "birthday shoutout," and she stepped up two to three feet to get onto the stage. Ms. Campbell testified she was not intoxicated but acknowledged she was "buzzed." She testified that she appeared to lose her balance only because she was "squeezing between speakers." Ms. Campbell denied that Mr. Bullard asked her to get off the stage, asserting instead, "He immediately put his hand on me and forcefully grabbed me and spun me around to the point where I couldn't control my body. I couldn't decide where I wanted to go, what I wanted to do. I was never asked. I was never guided. I was never given the opportunity to make a decision for myself." She elaborated, "He spins me around, turns me around, drops me off the back of the stage. I immediately hit the concrete, fall on my back and my head." Ms. Campbell stated that Mr. Bullard pushed her across the stage and then dropped her. She noted that there were no signs prohibiting her from getting on stage.

Ms. Campbell left Luke's almost immediately after falling. Her nose began to bleed at the next establishment they visited, and she began to vomit when the group went to eat in the early morning hours. Ms. Campbell stated that she continued to feel unwell during the weekend and on the plane ride home, but she acknowledged she continued to go to bars

---

[1] Certain videos taken before Ms. Campell got on stage, after she fell, and a brief snippet of Ms. Campbell on stage were introduced. Security footage which apparently showed the accident was put before the jury; however, this video is protected by a password that neither party has provided to this court.

over the next two days, stayed out until around 2 a.m. each night, and did not seek medical attention at the time. She was ultimately diagnosed with a concussion and post-concussive syndrome as a result of the fall. She was under the care of a neurologist from March 12 until June 22, 2020, and she was ordered to refrain from work. Ms. Campbell testified she was unable to read or watch television. In late April, she was given a new medication, and she continued to have "bad days" where she would have to remain in bed; on "good days" she was able to hike or play board games. She began to work part-time with support on May 26. The defense introduced five TikTok videos posted by Ms. Campbell's sister-in-law on April 10, 2020, depicting Ms. Campbell dancing and moving about.[2] Ms. Campbell explained that her neurologist told her she was permitted to move as tolerated.

On cross-examination, Ms. Campbell was asked to explain her claimed lost wages in the amount of $15,000, and she stated she arrived at the number from her "W-2 and time off from work." She was asked if she recalled her deposition testimony regarding the calculation of lost wages: "So you said you used your hourly wages. You also used your pay stub as far as what you were paid out for your medical leave." Ms. Campbell's counsel objected, noting that a motion in limine to exclude collateral source evidence had been granted. The trial court overruled the objection.[3] The following testimony was admitted:

Q. All right. So back to what I was saying. Ms. Campbell, you testified that in order to get to the $15,000 you used your hourly wages, you also used your pay stub, as far as what you were paid out for medical leave. And towards the end, you had used your medical leave so you were only getting two-thirds or, like, 66 percent pay, is that accurate still today?

A. Yeah. I mean, pay stubs, W-2, that's all the same to me. But, yeah.

Q. Ms. Campbell, what was your hourly wage at the time that you lost wages?

A. I want to say it was 23 an hour.

Q. Are you guessing, or do you know it for a fact?

A. In 2020, I — in 2020, in that role, retirement services, it was 23 an hour.

Q. Definitely?

___

[2] While counsel described these videos as depicting Ms. Campbell dancing and imitating a horse, these videos were protected by a password that was not provided to this court. Ms. Campbell acknowledged in her testimony that she was dancing in one video and not lying down in the dark in any of them.

[3] It appears that some of Ms. Campbell's deposition testimony, in which she stated she received three months of pay as medical leave, was displayed to the jury.

A.  To the best of my knowledge right now.

Q.  Ms. Campbell, that makes it sound like you're not 100 percent really — what I'm trying to get at is, you know, I think $15,000 is a lot of money, do you?

A.  Yeah.

Q.  And so, I mean, I'm a little confused as to how you're getting to that calculation.  I mean, you know, I feel like you're coming to ask the jury to grant you $15,000 in lost wages based on your word.  I mean, do you have any calculations that you can show us?

A.  I have calculations that I did based on when I left — or when I missed work back in March, April, May, and then back full time in June.  And exactly like I said, there was a portion where I wasn't getting my full salary, so I calculated full salary of that full 3 1/2 months.  But, yes, I fully did calculations.  I didn't just come up with a magic number.

Q.  Did you bring the calculations with you?

A.  They're at my hotel.

Q.  But you didn't bring them with you today?

A.  They're not here in the courtroom.

Q.  But you still want the jury to award you $15,000 in lost wages?

A.  I do.

Ms. Campbell's counsel moved for a mistrial, stating that the evidence violated the collateral source rule, and the trial court denied a mistrial.  The jury was instructed to consider this evidence for the limited purpose of establishing lost wages:

Evidence of insurance has been admitted for the limited purpose of establishing lost wages.

You may consider evidence of insurance only for this limited purpose.

There are sound reasons for this rule.  A party is no more or less likely to be negligent because a party does or does not have insurance.  Injuries and

damages, if any, are not increased or decreased because a party does or does not have insurance.

Ms. Campbell did not object to this instruction. The jury was further instructed that "Testimony that you have been instructed to disregard is not evidence and must not be considered. If evidence has been received only for a limited purpose, you must follow the limiting instructions I have given you."

The jury returned a verdict for the Defendants, finding that Mr. Bullard was not at fault for the injury. The verdict form began by asking, "Do you find the Defendant, Chris Bullard, to be at fault? (Plaintiff, Tatum Campbell, has the burden of proof)." The jury checked the box marked, "No." Accordingly, the trial court entered judgment for the Defendants. The Plaintiff moved for a new trial, arguing that defense counsel's opening argument and the reference to medical leave, or the cumulative effect of these errors, entitled her to a new trial. She also asserted that the verdict was against the weight of the evidence.

The trial court denied the motion for a new trial. The trial court concluded that the curative instructions regarding the lottery comment were sufficient to address any error. The court observed that the evidence regarding medical leave was admitted to "give the plaintiff an opportunity to expound upon how she calculated her lost wages" and that the benefits themselves were not admitted. The trial court determined that no evidence of a collateral source for the lost wages was admitted, noted that no written evidence of the collateral source was admitted, and concluded that the jury instruction that admonished the jury not to consider collateral sources of compensation was sufficient to address any error. The court found that the cumulative effect of any error did not affect the verdict, and it affirmed the defense verdict as the thirteenth juror.

## II.

"A trial court's decision regarding whether to grant or deny a motion for a new trial is discretionary in nature, and we accord such rulings great deference. We will only disturb such a decision if it amounts to an abuse of discretion." *Buckley v. Elephant Sanctuary in Tenn., Inc.*, 639 S.W.3d 38, 53 (Tenn. Ct. App. 2021) (quoting *Ali v. Fisher*, 145 S.W.3d 557, 564 (Tenn. 2004)). "An abuse of discretion occurs when the trial court applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *West v. Schofield*, 460 S.W.3d 113, 120 (Tenn. 2015). Under Rule 36(b) of the Tennessee Rules of Appellate Procedure, "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

On appeal, Ms. Campbell asserts that counsel's statement during opening argument constitutes reversible error. Opening statements set forth the facts and theories which will be relied on by the parties at trial. *State v. Van Tran*, 864 S.W.2d 465, 475 (Tenn. 1993). They are not evidence but intended to inform the trier of fact of the nature of the case and to outline the facts each party intends to prove. *Bradley v. Bishop*, 538 S.W.3d 518, 534 (Tenn. Ct. App. 2017). "Trial courts have wide discretion in controlling arguments of counsel, including opening statements . . . ." *Stanfield v. Neblett*, 339 S.W.3d 22, 41 (Tenn. Ct. App. 2010) (quoting *State v. Johnson*, No. W2004-00464-CCA-R3-CD, 2005 WL 645165, *14 (Tenn. Crim. App. Mar. 15, 2005)).

As noted above, Mr. Bullard's counsel stated during opening argument that Ms. Campbell hoped to be a "lottery lawsuit winner." Ms. Campbell's counsel objected and later sought curative instructions while suggesting that counsel "may still move for a mistrial depending on [how] strong the curative instruction is." The trial court agreed with Ms. Campbell that the comment was inappropriate and gave a curative instruction that the comment about a lottery was "improper" and that the jury should disregard it. After hearing the curative instruction, Ms. Campbell's counsel responded, "That's fine," and elected not to seek a mistrial. The jury was further instructed that opening statements are not evidence.

Ms. Campbell's counsel now seeks a new trial based on the remark. However,

> Statements made by counsel can be cured by the use of curative instructions. *Mitchell v. Jennings*, 836 S.W.2d 575, 581 (Tenn. [Ct.] App. 1992). Appellate courts must presume the jury followed the instructions of the trial court unless there is proof to the contrary. *Johnson v. Lawrence*, 720 S.W.2d 50, 60 (Tenn. [Ct.] App. 1986). Here, there is no proof in the record that the jury did not follow the court's curative instruction. Moreover, there was no request for a mistrial. As previously stated in this opinion, failure to request a mistrial as soon as its grounds are known results in waiver. *Spain v. Connolly*, 606 S.W.2d 540, 544 (Tenn. [Ct.] App. 1980).

*Buckley*, 639 S.W.3d at 53 (quoting *Oldham v. Pickett*, No. 01-A-01-9211-CV00441, 1993 WL 95590, at *2 (Tenn. Ct. App. Apr. 2, 1993)).

"[W]e presume that the jury follows the curative instructions of the trial judge." *Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 444 (Tenn. 2015). "Appellate courts have previously held that a brief, isolated, albeit improper statement made by attorneys during the course of trial does not constitute reversible error where the trial court gave a curative instruction." *Bradley*, 538 S.W.3d at 535 (citing cases).

We find Ms. Campbell's citation to *Schoon v. Looby*, 670 N.W.2d 885 (S.D. 2003),

where defense counsel personally vouched for the defendant, made inaccurate statements of fact and law, and used inflammatory language regarding the lottery, unpersuasive as applied to the circumstances of the present case. In *Schoon*, unlike the present case, there were numerous improper comments, and there were no curative instructions. *Schoon*, 670 N.W.2d at 887-91 (examining a litany of counsel's statements ranging from misstatements of the facts and law to inflammatory suggestions).

Here, the jury was instructed to disregard the comment, which was a single stray remark made during opening argument. We simply see no basis from this record to conclude that the trial court abused its discretion in declining to order a new trial on this basis.

IV.

Ms. Campbell also contends that evidence admitted in violation of the collateral source rule requires a new trial. The Defendants argue that the evidence was not admitted in error and that any error could not have affected the judgment because the jury found that Mr. Bullard was not at fault in Ms. Campbell's fall, rendering any compensation she received from collateral sources immaterial to the verdict. We conclude that the trial court did not abuse its discretion in denying the motion for a new trial.

As noted above, Ms. Campbell was unable to articulate how she arrived at the lost wages figure at trial. Ms. Campbell was required to prove the extent of her injuries, both physical and monetary, to the jury. Counsel's cross-examination highlighted the fact that no methodology for arriving at the figure had been presented into evidence. Luke's counsel then referenced her deposition testimony that she relied in part on pay stubs showing the income she received through medical leave. Ms. Campbell's counsel immediately objected, but the trial court permitted the testimony, which referenced the fact that Ms. Campbell received wages as part of medical leave after the concussion and that she only received partial compensation. The jury instructions admonished the jury to consider these payments only "for the limited purpose of establishing lost wages" and not to consider the payments with regard to fault.

Trial courts have broad discretion regarding evidentiary decisions, and this court reviews such decisions for an abuse of discretion. *Caldwell v. Ruby Falls, LLC*, 674 S.W.3d 899, 908 (Tenn. Ct. App. 2023) (citing *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005)). A trial court abuses its discretion "when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). As noted above, a trial court's decision on a motion for a new trial is reviewed under an abuse of discretion standard. *Buckley*, 639 S.W.3d at 46.

As Ms. Campbell properly notes, the collateral source rule generally bars any evidence that any part of the injury has been covered by insurance. *Dedmon v. Steelman*, 535 S.W.3d 431, 444 (Tenn. 2017); *see Illinois Cent. R. Co. v. Porter*, 94 S.W. 666, 669-770 (Tenn. 1906) (affirming exclusion of evidence of paid leave that the injured party received from his employer). The reasoning behind the rule is a desire to hold the tortfeasor responsible and to avoid turning a benefit to the injured party to the tortfeasor's benefit. *Dedmon*, 535 S.W.3d at 443 (citing Restatement (Second) of Torts § 920A, cmt. b (1979)). The collateral source rule is both a substantive rule of law and an evidentiary rule. *Id.* "Substantively, it affects the amount of damages that may be awarded against a defendant by prohibiting reduction of a plaintiff's recovery by benefits from sources unrelated to the tortfeasor." *Id.* The collateral source rule not only prohibits the substantive application of insurance-related evidence but also affects the admissibility of such evidence: "If a plaintiff's recovery may not be reduced by collateral benefits, then 'evidence that a plaintiff has received benefits or payments from a collateral source independent of the tortfeasor's procuration or contribution' must be excluded." *Id.* at 444 (quoting *Bozeman v. State*, 879 So.2d 692, 699 (La. 2004)). The reason for the blanket exclusion of such evidence is the risk that the jury will reduce damages based on collateral benefits. *Id.*

Employment benefits are included among collateral benefits and cannot operate to reduce the defendant's liability. *Porter*, 94 S.W. at 670 (affirming exclusion of evidence of paid leave that the injured party received from his employer); *see Dedmon*, 535 S.W.3d at 444 n.7 (the rule includes employment benefits, which "may be gratuitous, as in the case in which the employer, although not legally required to do so, continues to pay the employee's wages during his incapacity" (quoting Restatement (Second) of Torts § 920A(c)(2), cmt. c (1977)); *see also Fye v. Kennedy*, 991 S.W.2d 754, 763 (Tenn. Ct. App. 1998) (adopting section 920A of the Restatement). "The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him." Restatement (Second) of Torts § 920A(b) (1979). Accordingly, evidence regarding employment benefits is not admissible as a basis for reducing lost wages. *See Dedmon*, 535 S.W.3d at 444; *Porter*, 94 S.W. at 670-71.

Ms. Campbell asserts that evidence she received any amount of medical leave was reversible evidentiary error. Closely on point with the present case is *Asbill v. Franklin*, a case assessing prejudice in the admission of collateral source information when the jury found no liability. 423 S.W.2d 279, 280 (Tenn. Ct. App. 1967). In that case, after an auto accident, the defendant introduced evidence that the plaintiff took annual earned leave and accordingly did not lose income as a result of the injury, and the jury returned a defense verdict. *Id.* at 279. This court agreed that the evidence was admitted in error and in violation of the collateral source rule. *Id.* at 280. Nevertheless, this court held the error was harmless: "we are of the firm opinion that such error was not prejudicial and did not materially affect the result of the trial." *Id.* This court's reasoning was based on the jury's rejection of fault because, just as in the present case, "[t]he evidence in question goes to the issue of damages while the jury found against the plaintiff on the issues of negligence

and proximate cause." *Id.*

Asked at oral argument to distinguish the present case from *Asbill*, Ms. Campbell's counsel relied on a parenthetical quotation from *Dedmon v. Steelman*, citing to *Loncar v. Gray* for the proposition that "[t]he collateral source rule exclud[es] evidence of other compensation on the theory that such evidence would affect the jury's judgment unfavorably to the plaintiff *on the issues of liability and damages*." *Dedmon*, 535 S.W.3d at 444 (quoting *Loncar v. Gray*, 28 P.3d 928, 933 (Alaska 2001)) (emphasis added). Ms. Campbell appears to understand this as a pronouncement from the Tennessee Supreme Court that any reference in violation of the collateral source rule constitutes per se reversible error and, accordingly, as an abandonment of the Tennessee Rule of Appellate Procedure 36 harmless error standard where such error occurs. That is an enormous amount of weight for this proposition to bear, and for multiple reasons, this reference simply does not bear the weight Ms. Campbell seeks to load upon it.

Most importantly, the Tennessee Supreme Court has indicated that "[t]he injection of insurance during trial . . . does not necessarily warrant a mistrial. . . ." *Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 198 (Tenn. 2009). The Tennessee Supreme Court has stated "when the reference to insurance was made willfully for the purpose of influencing the jury," then the injection of insurance during trial "may" warrant a mistrial. *Id*. at 198. In the absence of such a willful attempt to prejudice the jury, "a curative instruction to the jury not to consider insurance will suffice because juries are presumed to follow the court's instructions." *Id*. at 198-99.

A transgression of the collateral source rule is viewed qualitatively differently by Tennessee courts when the rule is violated willfully to prejudice the opposing party. As a general proposition, a mistrial "should be granted" where counsel "has wilfully and voluntarily referred to liability insurance for the purpose of improperly influencing the jury." *Lovin v. Stanley*, 493 S.W.2d 725, 728 (Tenn. Ct. App. 1973); *see also W. End Recreation, Inc. v. Hodge*, 776 S.W.2d 101, 104 (Tenn. Ct. App. 1989) ("Where an attorney willfully and voluntarily refers to liability insurance for the purpose of influencing a jury, a mistrial should be granted."). This court has observed that Tennessee judicial decisions "have emphasized that a party's deliberate attempt to interject such evidence, especially if persistently pursued, is more apt to lead to reversal than is an inadvertent reference to insurance." *Monypeny v. Kheiv*, No. W2014-00656-COA-R3-CV, 2015 WL 1541333, at *13 (Tenn. Ct. App. Apr. 1, 2015) (quoting *Stroud v. Seaton*, No. 03A01-9802-CV-00060, 1998 WL 641923, at *2 (Tenn. Ct. App. Sept. 18, 1998)).

Whether the violation of the collateral source rule is of such a stripe is "more or less a question for the trial court, to exercise his [or her] discretion on." *Goff*, 297 S.W.3d at 199 (quoting *McClard v. Reid*, 229 S.W.2d 505, 506 (Tenn. 1950)); *see also Steward v. Smith*, No. M2009-00048-COA-R3-CV, 2009 WL 2951146, at *2 (Tenn. Ct. App. Sept. 14, 2009) ("It is within the sound discretion of the trial court, however, to determine

- 10 -

whether the plaintiff has intentionally injected the question of insurance to the prejudice of the defendant."). Ultimately, "whether a reference to insurance is egregious enough to warrant a new trial is a matter that addresses itself to the sound discretion of the trial court." *Monypeny*, 2015 WL 1541333, at *13 (quoting *Stroud*, 1998 WL 641923, at *2).

In considering Ms. Campbell's argument, we understand the referenced *Dedmon* language as consistent with an understanding that an error in relation to the collateral source rule can bleed into the question of liability. We do not regard it as a *sub silentio* abandonment of *Goff* and embrace of a collateral source reference as being per se reversible error without any consideration of whether such an error is harmless. In other words, the Tennessee Supreme Court's conclusion that "[t]he injection of insurance during trial, however, does not necessarily warrant a mistrial" remains good law. *Goff*, 297 S.W.3d at 198. Such errors can be harmless. *See Goff*, 297 S.W.3d at 198; *Monypeny*, 2015 WL 1541333, at *13; *Steward*, 2009 WL 2951146, at *2-4; *Anderson v. Mason*, 141 S.W.3d 634, 640 (Tenn. Ct. App. 2003); *Coffey v. Noll*, No. 01A01-9712-CV-00709, 1999 WL 20778, at *6 (Tenn. Ct. App. Jan. 20, 1999); *Asbill*, 423 S.W.2d at 280; *Seals v. Sharp*, 212 S.W.2d 620, 623 (Tenn. Ct. App. 1948).[4]

Given that a collateral source reference can be harmless error, the question becomes whether the reference to collateral source evidence was harmless in the present case. The confluence of seven factors in the present case persuades us that the trial court did not abuse its discretion in concluding that this is not a case in which a new trial is warranted.

One, the jury apparently never reached the question of damages in this case as evidenced by the jury verdict form finding Mr. Bullard not to be at fault. As noted in *Asbill*, this tends to indicate that an error regarding the collateral source rule is harmless. *Asbill*, 423 S.W.2d at 279-80; *see also, e.g.*, *U.S. Indus., Inc. v. Austin*, 397 S.E.2d 469, 470-71 (Ga. Ct. App. 1990) (erroneous admission of collateral source evidence was not prejudicial because the jury resolved the matter on liability and never reached the issue of damages); *Wisker v. Hart*, 766 P.2d 168, 176 (Kan. 1988) ("The erroneous admission of the collateral source evidence could have reduced the damages had the jury reached the point of determining damages. It did not reach this point and hence, . . . the error in admitting the collateral source evidence on damages becomes immaterial." (citation omitted)); *Hart v. W.H. Stewart, Inc.*, 564 A.2d 1250, 1251 (Pa. 1989) (agreeing with the argument that "even if the collateral source rule was violated by admission of this evidence, the resulting error

---

[4] Ms. Campbell filed a letter citing out-of-state supplementary authorities under Tennessee Rule of Appellate Procedure 27(d) for the proposition that the introduction of collateral source evidence necessarily requires reversal. The Defendants moved to strike the filing, and Ms. Campbell opposed the motion to strike. Accepting for purposes of argument Ms. Campbell's understanding of these out-of-state authorities, we would still not find them persuasive on this issue; rather, we adhere to Tennessee caselaw which provides that admission of such evidence can be harmless error if it is not willfully introduced to improperly influence the jury or so pervasive as to create prejudice.

was harmless because the rule relates only to damages, and the jury, which found for appellant on the issue of liability, never reached the issue of damages"); *City of Milwaukee v. NL Indus.*, 762 N.W.2d 757, 780 (Wis. Ct. App. 2009) (stating that "there is no basis in the record, other than one that calls for speculation, to support the conclusion that the collateral source evidence affected the jury's liability findings").

Two, this is not a case in the which the collateral source evidence directly affected liability. In *Tipton v. Socony Mobil Oil Co.*, the defendant brought into evidence and made extensive and repeated references to the plaintiff, who was bringing suit against his employer under the Jones Act, having accepted compensation benefits under the Longshoreman's and Harbor Workers' Compensation Act. *Tipton*, 375 U.S. 34, 34-37 (1963). The latter Act is "explicitly inapplicable to a 'member of a crew of any vessel.'" *Id*. at 35 (citation omitted). Problematically for the plaintiff, "[t]he principal issue [in the case] was whether, in view of the nature of the work performed at the time of injury, the petitioner was a seaman, hence within the coverage of the Jones Act, or an offshore drilling employee." *Id*. at 34. This court in *Asbill*, reflecting on *Tipton*, observed that in deciding that a new trial was warranted the *Tipton* Court "did so recognizing the evidence of payment of such benefits had a direct effect on the principal issue in the case." *Asbill*, 423 S.W.2d at 280. There is no such direct effect in the present case.

Three, absolutely nothing in the record suggests that the trial court regarded counsel's questioning as a willful violation of the collateral source rule that had the purpose of improperly prejudicing Ms. Campbell. Quite to the contrary, the trial court did not even view the reference in the present case as running afoul of the collateral source rule, much less constituting a willful violation of the collateral source rule with an improper purpose of improperly prejudicing the opposing party. Addressing defense counsel's questioning during its oral ruling, the trial court indicated that the questioning "seems pretty innocuous."

Four, the trial court provided a curative instruction. As to the offending evidence, the jury was instructed to consider this evidence for the limited purpose of establishing lost wages:

> Evidence of insurance has been admitted for the limited purpose of establishing lost wages.
>
> You may consider evidence of insurance only for this limited purpose.
>
> There are sound reasons for this rule. A party is no more or less likely to be negligent because a party does or does not have insurance. Injuries and damages, if any, are not increased or decreased because a party does or does not have insurance.

- 12 -

The jury was further instructed that "Testimony that you have been instructed to disregard is not evidence and must not be considered. If evidence has been received only for a limited purpose, you must follow the limiting instructions I have given you."

In *Goff*, when addressing a transgression of the collateral source rule, the Tennessee Supreme Court expressly stated that "[i]n the absence of such willful injection, a curative instruction to the jury not to consider insurance will suffice because juries are presumed to follow the court's instructions." *Goff*, 297 S.W.3d at 198-99. While we are not without concern as to whether this instruction properly addressed the collateral source rule in connection with the matter of damages in this case, the curative instruction did plainly direct the jury not to consider the offending evidence in relation to the question of fault. In other words, while the instruction may not have been the proper one, given that the jury decided the case based upon fault and the jurors were instructed not to consider the evidence in relation to fault, this is further indication that the error was harmless.

Five, the references in this case were not persistent. There were only two brief references to medical leave in the context of clarifying how Ms. Campbell arrived at the figure of $15,000 in lost wages as a portion of the claimed damages of $200,000. The testimony at trial revolved around and was focused upon whether Mr. Bullard dropped Ms. Campbell off the stage or whether she stepped backwards and fell. The jury viewed video evidence, heard the testimony of witnesses, and ultimately concluded that Mr. Bullard was not negligent — in the terms of the verdict form, not "at fault" — for Ms. Campbell's fall. As noted above, this is ultimately a case about whether Ms. Campbell fell or was pushed, and it is difficult to see how these two somewhat opaque and limited references prejudiced the jury's determination as to fault.

Six, endeavoring to explain how this evidence adversely impacted her case, especially given that the jury decided the case upon fault, Ms. Campbell asserts that the admission of this improper evidence served to make her look untruthful. The trial court, however, expressly addressed and rejected this argument and indicated that the evidence did not have that impact. Rather than undermining her credibility, the trial court concluded that the evidence had actually bolstered Ms. Campbell's credibility because it showed that she did have a foundation for her lost wages claim.[5] Additionally, the trial court observed

---

[5] In considering the motion for new trial, the following exchange occurred between counsel for Ms. Campbell and the trial court judge:

[Counsel for Ms. Campbell]: … [I]t allowed them to unfairly make her look like she was lying.

THE COURT: How is that?

[Counsel for Ms. Campbell]: What do you mean, how is that? It made [her] look like she wasn't telling the truth, Your Honor.

THE COURT: How? Explain it to me.

[Counsel for Ms. Campbell]: Because she was claiming $15,000 of lost wages, which we filed a motion in limine for — to allow her to be able to testify to under Rule 702, I believe, maybe 701. And she goes to do that —

THE COURT: Well, but that's — you are taking it out of the context a little bit . . . because the testimony was that she had a $15,000 number. And she testified that she did not bring the support for that with her to trial, correct?

[Counsel for Ms. Campbell]: Correct.

THE COURT: And she had really no way to explain how she came to 15,000. And isn't it true, then, that counsel for the defendant reminded her that in her deposition she had used her leave-time calculation to come up with that number? How is that undermining her credibility? Is that not actually helping her establish the basis for her calculation?

[Counsel for Ms. Campbell]: Absolutely not.

THE COURT: Why not?

[Counsel for Ms. Campbell]: I will tell you why not. Because it is a clear violation of *Dedmon*.

THE COURT: No, you are not answering my question.

[Counsel for Ms. Campbell]: Well, I am.

THE COURT: No, you're not. . . . I did not see the testimony. I did not — as I sat here and listened to the testimony, I felt that it actually helped your client. That was my sense of it.

[Counsel for Ms. Campbell]: I would totally disagree with that, Your Honor. That, respectfully, from my standpoint, is a mischaracterization.

THE COURT: Well, you agree, however, that she, on cross examination, could not articulate how she calculated it, correct?

[Counsel for Ms. Campbell]: She did. She said she come up with it. And then they tried to impeach her with those medical-leave benefits, which are blatantly inadmissible. They cannot come in. And they came in. . . . And it cast her in an unfair light, like she wasn't truthful. And that kept them from getting to any of the issues.

THE COURT: There was plenty of other evidence that she was not truthful about, correct?

[Counsel for Ms. Campbell]: No.

THE COURT: What about the evidence in the videos?

- 14 -

that what had undermined Ms. Campbell's credibility was her testimony referencing being bound to remain in bed when the defendants presented TikTok videos of her being physically active during the same time period.

Seven, the trial court took the prudent step of considering whether the evidence, if improper, had impacted the jury's verdict. The trial court determined that it did not, and the trial court, accordingly, also rejected Ms. Campbell's motion on this alternative basis.

Ultimately, "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). The relevant standard of prejudice is provided by the Rule: "Under this rule an error is prejudicial if it 'more probably than not' affected the judgment." Tenn. R. App. P. 36(b), Advisory Comm'n Cmt. Accordingly, the trial court declined to grant Ms. Campbell's motion for a new trial. Given the confluence of the reasons addressed above, we conclude that the trial court did not abuse its discretion in declining to grant a motion for new trial.

V.

Ms. Campbell asserts that she is entitled to a new trial due to the cumulative effect of the "lottery" comment and the admission of evidence that she used medical leave. She cites to *Mayo v. Shine*, where the court concluded that an improper comment from the judge, while it "alone may not have risen to the level of reversible error, . . . was potentially prejudicial and, when considered together with the other errors as discussed in this Opinion, resulted in the Plaintiff being denied a fair trial." 392 S.W.3d 61, 68 (Tenn. Ct. App. 2012).

Under Tennessee Rule of Appellate Procedure 36(b), "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering

---

[Counsel for Ms. Campbell]: Your Honor, I don't believe the evidence in the videos showed she was untruthful. For example, I mean, I seen it a number of times. I know Mr. Mangelsdorf has. But, I mean, I don't think –

THE COURT: She testified extensively about her inability to get out of bed after the incident. And then she was unable to say that those videos were not taken during the same time frame. That, to me, is evidence of her lack of truthfulness. Pretty clear evidence.

[Counsel for Ms. Campbell]: Absolutely not, and I'll say why. She was diagnosed by a neurologist with a TBI, a traumatic brain injury. And she testified on the stand under oath that she had good days and bad days. And she testified she was with the sister-in-law on a good day when they made those horsing-around videos. But she couldn't look at the computer screens and the lights, and she's been inside, so –

the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). In the present case, in accordance with the reasoning set forth above, any errors at trial, individually or in the aggregate, do not rise to the level of affecting the judgment. Accordingly, we affirm.

VI.

For the foregoing reasons, we affirm the judgment of the Circuit Court for Davidson County. Costs of the appeal are taxed to the appellant, Tatum M. Campbell, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE